**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| | ) | |
| SUZANNAH VAN ROOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-cv-3665 (ABJ) |
| | ) | |
| ANB 623 LLC t/a BEUCHERT'S | ) | |
| SALOON, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**MEMORANDUM OPINION AND ORDER**

Plaintiff Suzannah Van Rooy was an employee at Beuchert's Saloon ("Beuchert's") when, after the presidential election in November 2024, her remarks about serving patrons with conservative political views were published in an article in the *Washingtonian*. Compl. [Dkt. # 1] at 2. Plaintiff's comments were greeted with an immediate backlash from members of the public, and she alleges that "[i]n an effort to pander to conservative patrons, . . . Beuchert's took to social media to separate itself from [plaintiff] and deflect the negative attention . . . by posting false and defamatory statements about [her]." Compl. at 3. Plaintiff brought this suit against Beuchert's and its owners, Nathan Berger, Brendan McMahon, and Thomas Paro, alleging claims of defamation, false light, intentional infliction of emotional distress, and wage fraud. Compl. ¶¶ 1–5, 105–149.

Plaintiff filed her complaint on October 15, 2025, and she voluntarily dismissed the claims against Thomas Paro without prejudice on January 27, 2026. *See* Compl.; Notice of Voluntary Dismissal [Dkt. # 16]. The remaining defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b) for failure to state a claim. Defs.' Mot. to Dismiss [Dkt. # 17]

("Mot."). The motion is fully briefed. Pl.'s Opp. to Mot. [Dkt. # 18] ("Opp."); Defs.' Reply in Supp. of Mot. [Dkt. # 19] ("Reply").

For the reasons stated below, the motion is **GRANTED IN PART AND DENIED IN PART.**

## BACKGROUND

According to the complaint, Beuchert's was a bar and restaurant located in Washington, D.C. that operated from 2013 to 2025. Compl. ¶ 8. Plaintiff worked at Beuchert's from 2022 until December 2024, during which she held multiple positions, including bartender, server, and assistant manager. Compl. ¶¶ 10–11. In August 2024, plaintiff was appointed to the position of "social media manager." Compl. ¶ 13. In that role, her responsibilities were to:

- Develop and manage content across social media platforms, including Instagram, TikTok and Facebook;

- Create engaging, on-brand visual and written content that aligned with [Beuchert's] marketing goals;

- Monitor social media trends, audience engagement, and competitor activity to optimize strategy; and

- Manage and grow social media communities, responding to comments and messages in a timely manner.

Compl. ¶ 13; Exs. to Compl. [Dkt. # 2] ("Pl.'s Exs.") at 3–5. As social media manager, she had access to the restaurant's Instagram and Facebook accounts, and she interacted with the public from those accounts. Compl. ¶¶ 14–15; *see e.g.*, Pl.'s Exs. at 6.

In November 2024, after the most recent presidential election, plaintiff used her personal Instagram account to reply to a post by a food editor from the *Washingtonian* "asking servers in the District if they would feel comfortable serving officials in the new Trump administration that had committed criminal offenses." Compl. ¶¶ 22–23. Plaintiff agreed to be interviewed in her

personal capacity, and after the interview, the *Washingtonian* quoted plaintiff in an article entitled, "Clashes Are Coming for Trump Officials Dining Out in DC – 'I have the power to make you wait 20 minutes to get your entrée'":

> 'This time around, there is kind of a sense of defeat and acceptance, but I hope people still do stand up to this administration and tell them their thoughts on their misbehavior,' says Suzannah Van Rooy, a server and manager at Beuchert's Saloon in Capitol Hill. 'I personally would refuse to serve any person in office who I know of as being a sex trafficker or trying to deport millions of people. It's not, Oh, we hate Republicans. It's that this person has moral convictions that are strongly opposed to mine, and I don't feel comfortable serving them.'

Compl. ¶¶ 23–26; Pl.'s Exs. at 15.

Following the article's publication on December 11, 2024, Beuchert's received a flood of negative comments by phone and through its social media accounts. Compl. ¶¶ 27–28. Plaintiff used Beuchert's account to respond to several of the social media comments surrounding the article, with varying degrees of hostility. Compl. ¶ 28. For example, to one comment on Facebook stating, "Has this staff member been disciplined for their statement?? There should be consequences for the inappropriate comments. Was just getting ready to never ever enter the door of your restaurant and to encourage others to do the same," plaintiff responded, "everyone has a right to refuse service to sex traffickers. You're safe, unless you're a sex trafficker. Are you a sex trafficker?" Ex. 3 to Decl. of Brendan McMahon [Dkt. # 17-2] at 1.

The complaint alleges that Berger, one of the owners of the restaurant, posted a message on Beuchert's Instagram and Facebook accounts on December 12:

> Recent comments made by a member of staff who had no authority to speak on behalf of the entire restaurant have been, quite rightly, flagged as inappropriate, hostile, intolerant, and unacceptable. This staff member does NOT speak for us as a restaurant. After the inauguration in January, we will begin serving our fourth administration as a neighborhood restaurant on Capitol Hill open to all and welcoming to all. We have always been a safe space for all. Everyone, especially anyone who feels prejudged or

3

misunderstood, will always find friendly service and a sympathetic ear at Beuchert's Saloon. Again, we deeply apologize for the comments made by a member of staff. They are NOT representative of our restaurant and do not reflect how we operate as a business, and how proud we are to be a gathering place on Capitol Hill.

Compl. ¶¶ 30–31; Pl.'s Exs. at 23, 24.

The post received many comments urging Beuchert's to terminate plaintiff, *see* Pl.'s Exs. at 25, and on December 13, Berger fired her via text message. Compl. ¶¶ 10, 29, 32–33; *see* Pl.'s Exs. at 1. After firing plaintiff, Berger posted a second message on Beuchert's social media accounts:

> We tried to take the night to review Ms. Van Rooy's full comments, and any other interviews she may have given, to make an informed decision as to her continued employment based on our employee contracts. Not only do Ms. Van Rooy's comments clearly violate our zero-tolerance policy on discrimination, but her decision to sign into our social media accounts in the middle of the night to post her rhetoric in wildly offensive responses to comments is a further breach of conduct and protocol. She has no authority to speak on our behalf, and her comments do not reflect the positions of over twenty other people who make up our staff. For these reasons as well as the sheer dismay and disgust we feel at her unforgivable behavior, Ms. Van Rooy has been dismissed immediately. Our staff and families (many of whom are personally offended by Ms. Van Rooy's comments about them) are still reeling from what Ms. Van Rooy said and did, and we as a restaurant are simply horrified to be associated with base prejudice. None of us saw this coming, and regret deeply that the voices of over two dozen people who work at Beuchert's Saloon are being silenced because of one person's awful behavior. No publication or news outlet has reached out to us, the actual managers and owners of Beuchert's Saloon, for comment but we would welcome the opportunity to clarify that Ms. Van Rooy is not a manager at our restaurant but instead a part time server and that she had no authority or permission to act as spokesperson or hijack our social media accounts. We beg you all not to condemn the group of hardworking folks who have made Beuchert's Saloon a neighborhood mainstay for over a dozen years. We are still the same restaurant known for its warm service and friendly staff, and hope you will all visit us soon. We look forward to serving you. All of you.

Compl. ¶¶ 34–35; Pl.'s Exs. at 26.

In the days that followed, various media outlets reported plaintiff's termination. *See, e.g.*, Compl. ¶¶ 40–41 (describing a New York Post article titled "Waiter fired after comments about refusing to serve some Trump officials"); Pl.'s Exs. at 31–186. During this time, plaintiff was also "doxed," that is, "her personal information, including her home address, personal email and personal social media accounts, was published online without her consent." Compl. ¶ 80. As a result, plaintiff received dozens of threatening emails, social media messages, phone calls, and physical mail to her home. Compl. ¶ 81; *see, e.g.*, Pl.'s Exs. at 28 ("Since you won't be working at Beuchert's Saloon anymore, do yourself a favor and go drink a gallon of bleach.").

At the time Beuchert's fired plaintiff, she was also working full-time as a Communications Specialist at Potomac Wave Consulting Inc. ("Potomac Wave"). Compl. ¶ 76. Potomac Wave also fired her shortly after the controversy broke, allegedly citing "the widespread negative public reaction to Beuchert's December 12 and 13 social media posts and the subsequent national and international media coverage." Compl. ¶ 79.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

I.    **Count One states a defamation claim based on five statements in defendants' social media posts, but not a defamation *per se* claim.**

Count One of the complaint is entitled "Defamation – Libel *Per Se*" and it alleges that defendants "published materially false and defamatory" statements about plaintiff that caused her to suffer both "presumed damages and actual injury." Compl. ¶¶ 105–10. Plaintiff bases the claim on seven statements from the December 12 and December 13 social media posts:

- "Recent comments made by a member of our staff who had no authority to speak on behalf of the entire restaurant have been quite rightly, flagged as inappropriate, hostile, intolerant and unacceptable."

- "We tried to take the night to review Ms. Van Rooy's full comments, and any other interviews she may have given, to make an informed decision as to her continued employment based on our employee contracts."

- "Ms. Van Rooy's comments clearly violate our zero-tolerance policy on discrimination."

- "[H]er decision to sign into our social media account in the middle of the night to post her rhetoric in wildly offensive responses to comments is a further breach of conduct and protocol."

- "[W]e as a restaurant are simply horrified to be associated with base prejudice."

- "[W]e would welcome any opportunity to clarify that Ms. Van Rooy is not a manager at our restaurant but instead a part time server."

- "[S]he had no authority or permission to act as spokesperson or hijack our social media accounts."

Opp. at 4–5.

To state a claim of defamation under D.C. law, a plaintiff must allege: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) that either that the statement was

actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005), quoting *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n.2 (D.C. 1997).

"The final element" of defamation "can be pleaded in two ways." *KLEO AG v. Rivada Networks, Inc.*, 148 F.4th 741, 745 (D.C. Cir. 2025). "First, a plaintiff can allege that the challenged statements were so inherently harmful that they were defamatory per se, in which case no additional showing of damages is required." *Id.*, citing *Farnum v. Colbert*, 293 A.2d 279, 281–82 (D.C. 1972). "Only statements about extreme subjects" fall into this category, including "statements imputing to a person a criminal offense; a loathsome disease; matter affecting adversely a person's fitness for trade, business, or profession; or serious sexual misconduct." *Id.* at 746 (internal citations and quotation marks omitted). "Second, a plaintiff can allege that the statements caused 'special damages,' a term that 'refers to actual pecuniary loss.'" *Id.* at 745, citing 1 *Law of Defamation* § 1:15 (2d ed. May 2025 update).

Defendants argue that plaintiff has failed to allege facts to support the first, third, and fourth elements of a defamation claim. As to the first element, they maintain that the complaint has not alleged that defendants "published a false statement of fact" because their statements were either protected opinion, or alternatively, substantially true. Mot. at 4–13. As to the third element, whether plaintiff has alleged the requisite level of fault, they argue that plaintiff is a limited-purpose public figure and she has failed to allege the applicable standard of fault: actual malice. *Id.* at 13–16. And as to the fourth element, defendants argue that their statements were not defamatory *per se*, meaning plaintiff must show special harm. *Id.* at 9 n.2.

**A. One statement and a portion of another statement are protected opinion, and one statement is not capable of defamatory meaning.**

Under the first element of defamation, the statement at issue must "at a minimum express or imply a verifiably false fact about [the plaintiff]." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). "Expressions of opinion are entitled to constitutional protection," *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983), so statements are generally not actionable "if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) (internal citation omitted). Statements of opinion, though, can still "be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Id.* (internal citation omitted).

Only one of the statements and a portion of another statement underlying the claim are protected opinions that are not actionable. The statement from the December 13 posts that, "[W]e as a restaurant are simply horrified to be associated with base prejudice," Compl. ¶ 34, 101, represents the defendants' subjective view of the situation which they perceived to be based in prejudice, and it is not an objectively verifiable fact. In the same vein, the portion of the first statement that plaintiff's comments "have been quite rightly, flagged as inappropriate, hostile, intolerant and unacceptable," Compl. ¶¶ 30, 96–97, is also protected opinion. While the language is inflammatory, it is still plain that defendants were stating how they felt plaintiff's remarks should be treated. These are the types of statements typically afforded constitutional protection, and they do not "imply" the existence of undisclosed defamatory facts because they are based on plaintiff's public comments to the *Washingtonian* and her public replies through Beuchert's social media accounts, not on undisclosed information to which only defendants were privy.

The rest of the statements concern whether plaintiff had authority to access and use Beuchert's social media accounts or to act as a spokesperson, whether she was a manager, whether her conduct constituted a "breach of conduct and protocol," and whether she violated the restaurant's "zero-tolerance policy on discrimination." Compl. ¶¶ 34, 96–103. These do not pertain to defendants' state of mind or their opinion of plaintiff; they are posited as facts that could be verified by reviewing the terms and conditions of plaintiff's employment and determining whether she did or did not have certain permissions or job titles.

That is not the end of the inquiry though. "Defamatory meaning and falsity are distinct elements of . . . defamation and are considered separately," *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990), and "[w]hen confronted with a motion to dismiss" a defamation claim, "a court must evaluate '[w]hether a statement is capable of defamatory meaning,' a question of law." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007), quoting *Weyrich*, 235 F.3d at 627.

The Court finds that one of the remaining statements is not actionable because it is not actually capable of defamatory meaning. A statement is defamatory "if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016), quoting *Wilner*, 760 A.2d at 594 (alteration in original). The statement "must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Id.*, quoting *Rosen v. Am. Isr. Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012). "[T]he defamatory meaning inquiry focuses only on whether a reasonable reader could understand a statement as tending to injure a plaintiff's reputation," *Moldea v. New York Times Co.*, 15 F.3d 1137, 1142 (D.C. Cir.), modified, 22 F.3d 310 (D.C. Cir. 1994), and "[i]t is only when the court can say that the publication

10

is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *White*, 909 F.2d at 518, quoting *Levy v. Am. Mutual Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964).

Defendants' statement that "[w]e tried to take the night to review Ms. Van Rooy's full comments, and any other interviews she may have given, to make an informed decision as to her continued employment based on our employee contracts," does not convey any defamatory meaning. The statement is a recitation of the actions that defendants claim they took in response to the article and the fallout, and their decision-making process concerning plaintiff's employment; unlike the statements that fell within the category of opinions, this sentence does not demean or denigrate the plaintiff, nor does it serve to make plaintiff appear to be odious, infamous, or ridiculous. Therefore, that statement is not actionable for the purposes of Count One.

## B. At this stage in litigation, the Court cannot find as a matter of law that the statements were substantially true.

Defendants also argue that their statements are not actionable because they were substantially true. Mot. at 10–13. The remaining statements underlying the defamation claim assert that: (1) plaintiff "had no authority to speak on behalf of the entire restaurant"; (2) her "comments clearly violate our zero-tolerance policy on discrimination"; (3) her "decision to sign into our social media accounts in the middle of the night to post her rhetoric in wildly offensive responses to comments is a further breach of conduct and protocol"; (4) she "is not a manager at our restaurant but instead a part time server"; and that she "had no authority or permission to act as spokesperson or hijack our social media accounts." Compl. ¶¶ 30, 34, 96, 98–100, 102–03.

The parties dispute the existence of the "employee contract," the "zero-tolerance policy on discrimination," and any "protocol," and they do not agree as to whether plaintiff had authority to speak on behalf of Beuchert's and whether she was a manager. Defendants ask the Court to find

11

that their statements were true as a matter of law, and they rely on multiple documents, including a copy of the Beuchert's server manual that "[e]very staff member . . . signed," Decl. of McMahon at 1, which includes the restaurant's "Policy Against Harassment":

> It is the policy of Beuchert's that it will not tolerate or condone any form of harassment, whether verbal, non-verbal, or physical, that is based on race, color, creed, religion, gender, sexual orientation, gender identity, national origin, age, disability, citizenship status, marital status, medical condition or status as a veteran. Beuchert's is committed to enforcing the requirements of the law with respect to harassment.

Mot. at 11–12.

But this is a motion to dismiss, which must be decided solely on the face of the complaint and any documents incorporated therein. The Court is required to assume the truth of the allegations and to draw all inferences in favor of the plaintiff. Plaintiff alleges that she never had an employment contract, that Beuchert's did not have a zero-tolerance policy on discrimination, and that it did not have a "conduct and protocol" to breach, and further that she was a manager at the restaurant and did have authority to speak on Beuchert's behalf as the social media manager. Compl. ¶¶ 11–15, 23, 96, 98–100, 102–03.

The question of whether defendants' statements about these matters were false will be more appropriately resolved at the summary judgment stage. Substantial truth itself "is a defense to defamation," and while the first element of the claim does require the court to "determine as a threshold matter whether a challenged statement . . . is verifiable – that is, whether a plaintiff *can* prove that it is false," *Moldea v. New York Times Co.*, 22 F.3d 310, 316–18 (D.C. Cir. 1994) (emphasis added), the Court has already explained that the statements remaining are capable of

12

being proven false.  Therefore, the motion to dismiss on the grounds that the four alleged false statements were substantially true will be denied.[1]

### C. Plaintiff is a limited-purpose public figure, and she pleaded the necessary allegations to meet the actual malice standard.

Next, defendants argue that plaintiff is a limited-purpose public figure, and so she must plead actual malice, not simply negligence, for purposes of the third element of her claim.  Mot. at 13–16.  Plaintiff contends that she is a private figure, and therefore, she need only plead that defendants were negligent in publishing their statements about her.  Opp. at 16–19.  Alternatively, she argues that she meets the actual malice standard.  *Id.* at 19–20.

If the plaintiff is "a purely private figure," the third element of defamation requires that she demonstrate "by a preponderance of the evidence that [the defendant] . . . published false and defamatory statements about [her] with mere negligence."  *Capitol Intel. Grp., Inc. v. Waldman*, 352 A.3d 783, 794 (D.C. 2026).  However, public figures, including limited-purpose public

---

1  Citing two cases from this district and a case from the Second Circuit, defendants assert that "[c]ourts regularly dismiss defamation cases on the ground that defendants' statements were substantially true."  Mot. at 10.  But both cases from this district are inapposite; they involve the dismissal of defamation claims in which the defendant publicized the plaintiff's public legal matters.  *See Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 217 (D.D.C. 2008) (dismissing defamation claim where the defendant referring to the plaintiff as a convicted pedophile when the plaintiff had been convicted of a child sex crime); *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 59 (D.D.C. 2012), *aff'd per curiam*, 553 F. App'x 1 (D.C. Cir. 2014) (dismissing defamation claim where the defendant publicized a prior civil judgment against the plaintiff and the fact that the plaintiff had been subject of a criminal investigation, which the plaintiff had disclosed on public record).  That is not the same here, where both parties have asked the Court to evaluate non-public evidence in support of the substantial truth determination.

The Second Circuit case does not support defendants' position; it reinforces the Court's ruling.  In that case, the Court held that "where the truth or falsity of the defendant's statement depends on material outside the complaint . . . the outside material may be presented by the defendant at summary judgment so the court may determine whether a legitimate question exists as to its truth or falsity."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 246–47 (2d. Cir. 2017).

figures, "must demonstrate by clear and convincing evidence that the defamatory statement was made with 'actual malice,' i.e., 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 646 (D.C. 2023), quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280, 285–86 (1964); *see also Waldman*, 352 A.3d at 794 (explaining that limited-purpose public figures must show actual malice in a defamation suit).

Whether a plaintiff is a limited-purpose public figure is a question of law, and the District of Columbia applies a three-part test. *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 505 (D.C. 2020). "First, the court must identify the relevant controversy and determine whether it is a public controversy. Second, the plaintiff must have played a significant role in that controversy. Third, the defamatory statement must be germane to the plaintiff's participation in the controversy." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) (internal citations omitted); *Fridman*, 229 A.3d at 505.

The first prong requires the Court to decide whether "the controversy to which the defamation relates was the subject of public discussion *prior* to the defamation," and whether 'a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.'" *Fridman*, 229 A.3d at 505 (emphasis in original), quoting *Moss v. Stockard*, 580 A.2d 1011, 1030 (D.C. 1990). Here, the controversy to which the defamation related to was the *Washingtonian* article and the views plaintiff expressed in it, and the complaint alleges facts that show that it was the subject of public discussion before the alleged defamatory posts on December 12 and 13. The complaint alleges that Beuchert's received a "deluge of phone calls" and comments immediately following the article's publication, Compl. ¶¶ 22–28, and that plaintiff herself replied to some of the comments posted on the restaurant's

14

social media by others. Compl. ¶ 28. This public dialogue in which plaintiff participated prompted the defendants' publication of the statements that are the subject of the defamation claim. Plaintiff's allegations concerning the public outcry and her role in it support a finding that it was reasonable to expect non-participants to have a stake in the controversy. In sum, the relevant controversy here was a public one, and defendants' comments were related to that controversy.

Regarding the second prong, it is clear from the complaint that plaintiff played a significant role in the controversy since she chose to respond to the inquiry from a journalist and went on the record with her name and title. Compl. ¶¶ 22–26; *see* Pl's. Exs. at 157 ("Most individuals who were interviewed remained anonymous, but [plaintiff] provided her real name."). And it was during that interview that she offered the opinions that triggered the backlash. *See* Compl. ¶ 26 ("I hope people still do stand up to this administration and tell them their thoughts on their misbehavior"); Pl.'s Exs. at 15 (plaintiff's opinions as presented in the *Washingtonian* article). Moreover, the complaint recounts how she responded to some negative commentary on Beuchert's social media by replying on the same platform.

As to the last prong, defendants' statements were germane to plaintiff's participation in the controversy, as they related and responded to the quotes from the *Washingtonian* article, and more directly, the public comments she made via Beuchert's social media accounts afterward. Compl. ¶¶ 30, 34. Therefore, putting aside the question of whether the statements were misconstrued or mischaracterized, and whether defendants' statements were true, the Court finds that plaintiff is a limited-purpose public figure for the purposes of this dispute, and she must plead actual malice.

Actual malice is a "demanding" standard that requires plaintiff to show that defendants knew that their statements were false, or recklessly disregarded whether they were false. *Awan*, 301 A.3d at 646. For defendants to have acted with reckless disregard, they must have had "a high

15

degree of awareness of [the statements'] probable falsity or entertained serious doubts as to [their] truth." *Waldman*, 352 A.3d at 797, quoting *Mann*, 150 A.3d at 1252.

The allegations in the complaint fulfill that standard. It alleges that the responsibilities of the social media manager included "[d]evelop[ing] and manag[ing] content across key social media platforms" and "responding to comments and messages in a timely manner." Pl.'s Exs. at 3. Plaintiff also alleges that she was "provided with Beuchert's social media credentials," Compl. ¶¶ 14, 98, and was told by defendants to "figure it out," after asking for guidance on social media management. Compl. ¶ 16. This all supports an inference that defendants had a high degree of awareness that plaintiff had authority and discretion over Beuchert's social media pages and to speak on its behalf through those tools.

Plaintiff also alleges that she was an assistant manager "responsible for managing severs during her shifts," and she included an exhibit to her complaint of a shift schedule listing her title as "Shift Manager/Assistant Manager." Compl. ¶¶ 11–13; Pl's Exs. at 2–5. While defendants contest whether these positions conferred sufficient authority to qualify as management, Mot. at 9–10, the allegations, when construed in plaintiff's favor, support a plausible inference that defendants knew or at least recklessly disregarded the fact that plaintiff was a manager. Compl. ¶ 102.

The complaint further alleges that "Beuchert's never actually presented [her] with a formal employment contract" and "[e]ven when [she] was hired as the social media manager, she did not sign an employment contract. Instead, [she] was provided with Beuchert's social media credentials." Compl. ¶ 98. Plaintiff adds that "Beuchert's did not have . . . any formal "zero-tolerance policy on discrimination," Compl. ¶ 99, or a "formal or tacit code of conduct or specific protocol for an employee doing an interview." Compl. ¶ 100. The complaint also provides that

16

defendants Berger and McMahon were "beneficial owner[s] and managing member[s] of Beuchert's," Compl. ¶¶ 3–4, and that Berger personally "terminated [plaintiff], via text message, and simultaneously revoked her access to Beuchert's Instagram and Facebook accounts." Compl. ¶¶ 29. Again, while defendants dispute whether these documents actually existed, the allegations regarding their responsibilities at the restaurant raise a plausible inference that they recklessly disregarded the truth in asserting that plaintiff violated the allegedly non-existing contracts and policies.

### D. The statements were not defamatory *per se*, but plaintiff sufficiently pleaded special damages for defamation.

Finally, as to the last element, the Court cannot say the remaining statements were inherently harmful or "virtually certain" to damage plaintiff's reputation, as necessary for a defamation *per se* claim. *KLEO AG*, 148 F.4th at 746. Defendants did not announce that plaintiff had committed a criminal offense, engaged in serious sexual misconduct, or suffered from some odious condition, and though the posts make comments about her conduct while working at Beuchert's, they do not go as far as making statements about her fitness for a career in restaurant or social media managing.

Though Count One of the complaint was confusingly titled "Defamation – Libel *Per Se*," the allegations underlying the claim stated that plaintiff suffered both "presumed damages and actual injury" from defendants' defamatory statements. Compl. ¶¶ 105–10. While the allegations fail to state the presumed damages necessary for defamation *per se*, plaintiff does allege the harm necessary for defamation. Simple defamation requires the plaintiff to "allege that the statements caused 'special damages,'" that is, "actual pecuniary loss." *KLEO AG*, 148 F.4th at 745, citing 1 *Law of Defamation* § 1:15 (2d ed. May 2025 update) (internal quotation marks omitted). The complaint alleges that plaintiff was terminated from her second job at Potomac Wave consulting

17

"based on the widespread negative public reaction to Beuchert's December 12 and 13 social media posts and the subsequent national and international media coverage." Compl. ¶ 79. In that role, she allegedly made "$85,000 annually . . . as a full-time consultant with Potomac Wave," Compl. ¶¶ 76, 79, so she has alleged the pecuniary loss required to state special damages for the purposes of a defamation claim.

Therefore, Count One has stated a defamation claim based on defendants' statements that:

- Plaintiff "had no authority to speak on behalf of the entire restaurant[.]"

- "Ms. Van Rooy's comments clearly violate our zero-tolerance policy on discrimination."

- "[H]er decision to sign into our social media account in the middle of the night to post her rhetoric in wildly offensive responses to comments is a further breach of conduct and protocol."

- "[W]e would welcome the opportunity to clarify that Ms. Van Rooy is not a manager at our restaurant but instead a part time server."

- "[S]he had no authority or permission to act as spokesperson or hijack our social media accounts."

## II.    Count Two is dismissed without prejudice.

It is not clear what type of claim Count Two intended to plead. It is titled the same as Count One, "Defamation – Libel per se," and the allegations are almost exactly the same, except that Count Two: (1) adds that "Beuchert's published the false and defamatory statements intentionally, deliberately, with actual malice and with reckless disregard for the foreseeable consequences for [plaintiff]"; and (2) omits any reference to "presumed damages" plaintiff suffered. *Compare* Compl. ¶¶ 105–110 *with* Compl. ¶¶ 111–17.

In the Court's view, this could be the defamation claim the Court has found was embraced in Count One when it rejected the claim of defamation *per se*. For their part, defendants "presume" that Count Two "was intended to be plead as Defamation by Implication." Defs.' Mot. at 16 n.5.

18

Plaintiff's opposition does not respond to that suggestion or defend Count Two specifically; it simply argues that the terms "base prejudice" and "discrimination" in the social media posts give rise to the defamatory implication that plaintiff is prejudiced and discriminatory.  Pl.'s Opp. at 14.

Federal Rule of Civil Procedure 8(b) requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and here, the allegations underlying Count Two are not sufficient to meet that standard.  Therefore, Count Two is dismissed without prejudice.

**III.    The false light claim under Count Three will survive on the same allegations underlying the defamation claim under Count One.**

A "false light claim requires a showing of: (1) publicity; (2) about a false statement, representation, or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be highly offensive to a reasonable person." *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 140 (D.C. 2021).  Given their similar elements, defamation and false light claims are often "analyzed in the same manner," especially "[w]here the plaintiff rests both . . . claims on the same allegations." *Id.*  Still, the remedies for defamation and false light are distinct – "[a] defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view." *Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D.D.C. 2017), *aff'd*, 886 F.3d 122 (D.C. Cir. 2018), quoting *White*, 909 F.2d at 518.

Given that plaintiff's false light claim is based on the same statements underlying the defamation claim, the Court finds that Count Three also survives for the same reasons that applied to Count One.

19

**IV.    The claim for intentional infliction of emotional distress under Count Four fails because plaintiff failed to plead extreme or outrageous conduct.**

Count Four brings a claim of intentional infliction of emotional distress, alleging that defendants "engaged in extreme and outrageous conduct" by publishing the defamatory statements about plaintiff on their social media accounts "with the intent to disparage, discredit, malign and impugn [her] character and professional reputation." Compl. ¶¶ 125–27.

To state a claim for intentional infliction of emotional distress in the District of Columbia, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Awan*, 301 A.3d at 656, quoting *Mann*, 150 A.3d at 1260. Extreme and outrageous conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*, quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n.10 (D.C. 1994). Liability is not imposed for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (internal citation and quotation marks omitted).

Plaintiff argues that defendants' decision to name her explicitly in their December 13 social media posts was extreme and outrageous. Opp. at 22. But while defendants' attempts to distance themselves from plaintiff were not necessarily constrained or measured, it cannot be said that they crossed the line from mere insult to atrocity, or that posts were so extreme as to go beyond all possible bounds of decency. The restaurant was under public attack and its reputation was at stake, and without expressing a view as to how the employers when about it, their attempt at damage control and their public announcement of her termination, the Court finds that the decision to name plaintiff in the post can hardly be considered extreme when plaintiff had already permitted herself to be named in the *Washingtonian* article. The District of Columbia Court of Appeals has warned

20

that "[c]alling pure speech about an issue of public concern 'extreme and outrageous' conduct is clearly reserved for the rarest of cases," *Awan*, 301 A.3d at 658, and this is not the "rare" case where the speech met the level necessary for intentional infliction of emotional distress. Therefore, Count Four will be dismissed.

### V.    The wage theft claims under Counts Five and Six will move forward.

Count Five alleges that "[b]etween January 12, 2024 and December 6, 2024, twenty-four of [plaintiff]'s paychecks . . . did not clear because of insufficient funds," and that she "had to wait more than two weeks to receive her regular paycheck from Beuchert's." Compl. ¶¶ 19, 129–49.

Section 32-1302 of the D.C. Code provides that "[a]n employer shall pay all wages earned to his or her employees on regular paydays designated in advance by the employer and at least twice during each calendar month." D.C. Code § 32-1302. To state a claim for wage theft under the law, plaintiff "must allege: (1) the complainant was an employee of the employer, (2) who performed work for the employer, (3) was not compensated or timely compensated for such work, and (4) the measure of damages due to the employee." *Zajac v. Finnegan, Henderson, Farabow, Garrett & Dunner LLP*, 346 A.3d 693, 701 (D.C. 2025).

The first and second elements are not at issue. Defendant argues that plaintiff cannot establish the third or fourth elements because, although her "initial checks did not clear," the restaurant would "immediately issue[] an alternate payment via Venmo or Zelle" which "were typically processed within minutes of [p]laintiff notifying [d]efendants of an issue." Mot. at 20; Decl. of Berger ¶ 6.

The fact that Beuchert's paid plaintiff by alternative means after her paychecks bounced does not mean that she failed to state a claim for wage theft. The third element requires her to plead either that she was "not compensated or *timely* compensated." *Zajac*, 346 A.3d at 701

(emphasis added).  Plaintiff's claim that she "frequently had to wait more than two weeks to receive her paycheck" is bolstered by the fact that Beuchert's had to use alternative means of paying her after she learned that her checks would not clear.  At this stage, the Court must take plaintiff's factual allegations regarding the bounced checks and late payments as true, and they suffice to state the third element of the wage fraud claim.

As to the fourth element of damages, plaintiff recognizes that her remedies would be limited by any wages that Beuchert's eventually paid her because District of Columbia Code "does not allow for double recovery of untimely wages that were paid."  Opp. at 23, citing D.C. Code § 32-1308(a)(1)(B) ("No person in any action brought pursuant to this section shall be awarded any amount already recovered by an employee).  But D.C. Code § 32-1308(a)(1)(A) also makes available "[s]tatutory penalties" and other "[s]uch legal or equitable relief as may be appropriate."  At this stage, the Court cannot say as a matter of law that plaintiff has suffered no damage connected to her wage fraud claim, and therefore, Count Five will move forward.

Finally, though defendants' motion asked the Court to dismiss the complaint in its entirety, Mot. at 3, defendants offered no grounds to support the dismissal of the separate wage fraud claim under Count Six.  *See generally* Mot.; Opp. at 23 n.9.

Count Six alleges that following her termination from Beuchert's, plaintiff had to wait ten days before receiving her final paycheck.  Compl. ¶ 20.  Section 32-1303(1) mandates that "[w]henever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge," D.C. Code § 32-1303(1), and a claim under this section is governed by the same four elements set out above.  *See Zajac*, 346 A.3d at 701, citing *Bongam*, 271 A.3d at 1162 ("A claim for wage theft must allege: (1) the complainant was an employee of the employer, (2) who performed work for the employer, (3) was not

22

compensated or timely compensated for such work, and (4) the measure of damages due to the employee."). Plaintiff alleges that defendants "tendered [her] final paycheck on December 23, 2024, 10 days after her termination," Compl. ¶ 148, and while her damages may be limited, she has plausibly stated a claim under the statute.

<strong>CONCLUSION</strong>

For the reasons stated above, defendants' motion to dismiss [Dkt. # 17] is **GRANTED IN PART AND DENIED IN PART**. A portion of Count One will move forward as a defamation claim, but not a defamation *per se* claim. Counts Three, Five, and Six will also move forward. Count Two is dismissed without prejudice, and Count Four is dismissed.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE: August 7, 2026